491 S.E.2d 1

**Alton E. DODRILL, Plaintiff Below, Appellee,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant Below, Appellant.**

No. 23090.

Supreme Court of Appeals of West Virginia.

Submitted May 2, 1996.

Decided Oct. 15, 1996.

Dissenting Opinion of Justice Workman July 21, 1997.

**4**

Timothy R. Ruckman, Callaghan & Ruckman, Summersville, for Appellee.

Maria Marino Potter, McQueen & Brown, L.C., Charleston, for Appellant.

ALBRIGHT, Justice:

This is an appeal by Nationwide Mutual Insurance Company from an order of the Circuit Court of Nicholas County in a civil action alleging violations of W.Va.Code § 31–11–4(9), relating to unfair insurance claim settlement practices. The order denied Nationwide's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, after a jury verdict was returned against Nationwide in the case. On appeal, Nationwide claims that the evidence adduced was insufficient to support the verdict, that the award of punitive damages was not supported by evidence of willful, malicious, and intentional conduct, and that the award of damages for annoyance and inconvenience was improper in the absence of testimony on that subject from the appellee, Mr. Dodrill. Nationwide also claims that the trial court erred in making various procedural and evidentiary rulings. After reviewing the issues presented and the record, this Court does not find reversible error. The judgment of the circuit court is, therefore, affirmed.

This case arises from the resolution of a claim in which Nationwide insured William E. Phares, the driver of a vehicle owned by Ralph Phares, collided with a vehicle owned and operated by the appellee, Mr. Dodrill. The circumstances of that underlying claim were described in a stipulation of facts which was presented by the parties to the court and read to the jury in this case. The stipulation states:

> On or about October 24, 1987, the Plaintiff, Alton E. Dodrill owned and operated a 1980 Ford automobile which was struck from behind by a 1981 Chevrolet automobile owned by Ralph Phares and operated by William E. Phares. The collision occurred on West Virginia Route 41, also known as Webster Road in the Town of Summersville, Nicholas County, West Virginia. Alton E. Dodrill was taken to the Summersville Memorial hospital where he was treated and released.

> The Phares' automobile was insured by Nationwide Mutual Insurance Company whose adjuster, Tim Porter, was responsible for investigating, evaluating, and adjusting the personal injury claim of Alton E. Dodrill. On December 11, 1987, Mr. Tim Porter, on behalf of Nationwide Mutual Insurance Company, offered to settle Mr. Dodrill's claim for the sum of Eighteen Hundred Dollars ($1800), which offer was rejected. On March 1, 1988, Mr. Porter offered, on behalf of Nationwide Mutual Insurance Company, the sum of Two Thousand Dollars ($2,000), plus a Scheduled Release to settle the claims of Mr. Dodrill.

> In May, 1988, Mr. Dodrill retained an attorney and suit was subsequently filed and after trial, a jury awarded to Mr. Dodrill the sum of Eleven Thousand Three Hundred Eighty–Six Dollars ($11,386) which was subsequently paid by Nationwide Mutual Insurance Company to Alton E. Dodrill, with interest.

On or about July 24, 1991, Mr. Dodrill filed his complaint in this action against Nationwide. The charging paragraph of the complaint stated:

> The actions of Nationwide Mutual Insurance Company, through its agents, servants and employees, constituted a violation of *West Virginia* Code § 33–11–4(9) in

that said defendant did not attempt in good faith to effectuate a prompt, fair and equitable settlement of plaintiff's claim, even though liability was reasonably clear on the part of its insured; and failed to promptly provide a reasonable explanation to plaintiff for the basis of its offer of a compromise settlement.

In the complaint, Mr. Dodrill sought punitive damages based upon Nationwide's conduct, which he alleged was "intentional, willful and wanton and in derogation of the defendant's statutory and common law duties to the plaintiff." Nationwide filed an answer to the complaint in which it denied conduct which constituted a violation of W.Va.Code § 33–11–4(9).[1]

A two-day jury trial of this action commenced May 24, 1994. The pre-trial order endorsed by the parties specified three issues to be tried before the jury: (1) whether W.Va.Code § 33–4–11–4(9) had been violated

---

1. West Virginia Code § 33–11–4(9) provides:

*Unfair claim settlement practices.*—No person shall commit or perform with such frequency as to indicate a general business practice any of the following:

(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

(f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered;

(h) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

(i) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

(j) Making claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;

(k) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

(*l*) Delaying the investigation or payment of claims by requiring an insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(m) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

(n) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

(*o*) Failing to notify the first party claimant and the provider(s) of services covered under accident and sickness insurance and hospital and medical service corporation insurance policies whether the claim has been accepted or denied and if denied, the reasons therefor, within fifteen calendar days from the filing of the proof of loss: Provided, That should benefits due the claimant be assigned, notice to the claimant shall not be required: Provided, however, That should the benefits be payable directly to the claimant, notice to the health care provider shall not be required. If the insurer needs more time to investigate the claim, it shall so notify the first party claimant in writing within fifteen calendar days from the date of the initial notification and every thirty calendar days, thereafter; but in no instance shall a claim remain unsettled and unpaid for more than ninety calendar days from the first party claimant's filing of the proof of loss unless there is, as determined by the insurance commissioner, (1) a legitimate dispute as to coverage, liability or damages; or (2) if the claimant has fraudulently caused or contributed to the loss. In the event that the insurer fails to pay the claim in full within ninety calendar days from the claimant's filing of the proof of loss, except for exemptions provided above, there shall be assessed against the insurer and paid to the insured a penalty which will be in addition to the amount of the claim and assessed as interest on such at the then current prime rate plus one percent. Any penalty paid by an insurer pursuant to this section shall not be a consideration in any rate filing made by such insurer.

by Nationwide "failing in good faith to effectuate a prompt, fair and equitable settlement . . .", (2) whether Mr. Dodrill sustained damages by reason of such violation and, if so, how much, and (3) whether Mr. Dodrill was entitled to punitive damages by reason of such violation.

In the course of the trial, three witnesses were called. These three witnesses were Timothy William Porter, the employee for Nationwide Mutual Insurance Company who initially handled Mr. Dodrill's claim, Donald K. Bischoff, an attorney of Summersville, West Virginia, and Mr. Dodrill himself.

Mr. Porter testified extensively regarding the procedures which he followed in assessing and handling Mr. Dodrill's claim. The activity log which Mr. Porter maintained while handling the claim was also admitted into evidence, without objection. The evidence adduced showed that Mr. Porter was a claims adjuster for Nationwide, who worked by telephone from Canton, Ohio, solely on small personal injury claims received by Nationwide. The property damage portion of any such claims were handled elsewhere, and Mr. Porter did not receive information regarding the settlement of that portion of the claims he handled. Instead, when advised of a personal injury claim, he contacted the claimants by phone and sought information from them about their alleged personal injuries. Based on that information and any received with the file, he evaluated the claim, attempted to settle it by telephone, and internally established a reserve for its settlement in accord with his evaluation and the progress of those negotiations. If the claimant retained an attorney, he made an initial contact with the attorney. Mr. Porter was not authorized to negotiate settlements with attorneys but was required, when the claimant retained an attorney, to turn the file over to another adjuster who was specifically authorized to deal with claimants' attorneys.

In conformity with this usual course of action, Mr. Porter first spoke to Mr. Dodrill about his injuries in the Phares collision on November 3, 1987, ten days after the collision. On that occasion, Mr. Porter took information from Mr. Dodrill which indicated that Mr. Dodrill had missed some work and that he was experiencing great pain in his neck and back, but that he had not yet seen a doctor. In the course of that contact, Mr. Porter advised Mr. Dodrill to see a doctor. He also arranged to mail Mr. Dodrill an attending physician's report form and a wage verification form.

Mr. Porter next had contact with Mr. Dodrill on December 3, 1987. Prior to or at that time, Mr. Porter received information about medical bills from Mr. Dodrill, and, based upon the evidence before him, Mr. Porter completed what he referred to as a "breakdown," which categorized the expenses incurred. On December 7, 1987, Mr. Porter again telephoned Mr. Dodrill, but it appears that Mr. Dodrill was unavailable. Mr. Porter then completed a computer-generated follow-up sheet to remind himself to contact Mr. Dodrill.

On December 8, 1987, Mr. Porter completed what was known internally within Nationwide as a "sixty-day pricing." On December 11, 1987, Mr. Porter again spoke with Mr. Dodrill, who was still experiencing a lot of pain. Mr. Porter's log relating to this conversation stated that Mr. Dodrill "is stubborn and does not want to see a doctor." On this date, December 11, 1987, Mr. Porter initially offered to settle Mr. Dodrill's claim for $1,800.00. Mr. Dodrill refused to accept this settlement amount and also refused to give Mr. Porter a figure for which he would settle. Mr. Porter advised Mr. Dodrill to think about how much he wanted and to give him a call in this regard. In the course of the conversation, Mr. Porter advised Mr. Dodrill that it would be prudent for him to see a doctor if he was still experiencing pain.

Mr. Porter explained that he arrived at the $1,800.00 settlement offer made on December 11, 1987, based on the medical and wage loss information then available to him. He said he then had available three medical bills incurred by Mr. Dodrill immediately after the accident totaling $217.00, including an x-ray bill, an ambulance bill, and an emergency room bill. He also had a statement which indicated that Mr. Dodrill had lost wages of $791.00. Mr. Dodrill had returned to work and had worked on a regular and continuous basis since October 26, 1987, two days after

the accident. At the time of the offer, Mr. Porter also had available an attending physician's report completed by Dr. Stephen W. Craft, which diagnosed Mr. Dodrill as having a whiplash-type injury and contusions, with no permanent injury expected. The report of the x-ray taken of Mr. Dodrill on the date of the accident showed no evidence of injury, but noted arthritic changes. At trial, Mr. Porter testified that there was no dispute regarding the fact that Nationwide was liable to Mr. Dodrill for his damages (within the Phares policy limits); the only question was how much those damages were. Mr. Porter also testified that Nationwide had a policy against pre-payment of medical bills, in advance of an overall settlement of such a claim. Accordingly, he made no offer to pre-pay the bills Mr. Dodrill had submitted.

On March 1, 1988, Mr. Porter again spoke to Mr. Dodrill. During this conversation, Mr. Dodrill again said that he was experiencing pain and indicated that he might need to consult a specialist, but that he could not find time to do so. At the time of this conversation, Mr. Porter increased Nationwide's settlement offer to $2,000.00 plus a scheduled release that would set aside money to pay for Mr. Dodrill's future medical bills. Mr. Dodrill refused to accept this settlement and indicated that he had not thought about a settlement amount. At the trial of this case, Mr. Porter explained that, based on his $2,000 offer, he established a reserve of $3,000.00 for this claim, making allowance for the future medical bills payable under the proposed "scheduled release" and that his maximum authority for settling Mr. Dodrill's claim at that time was $2,500. He testified that had Mr. Dodrill accepted the $2,000.00 offer, Mr. Porter would have retained authority to pay additional medical bills up to $500.00, but that it would have required the approval of his manager to pay more since the settlement of $2,000.00 plus $500.00 in additional medical bills would have exhausted his current authority. He also testified that he had settled claims in excess of his first authority, but such settlements required the approval of his manager.

By letter dated May 5, 1988, Mr. Porter received notification that Mr. Dodrill had retained an attorney to represent him. On the following day, Mr. Porter telephoned the attorney but was unable to reach him. The attorney returned Mr. Porter's call on May 12, 1988, and, during his conversation with Mr. Porter, the previous offers to Mr. Dodrill were discussed. The attorney advised Mr. Porter that he would most likely refer Mr. Dodrill to a specialist so that the specialist could evaluate Mr. Dodrill's injury. The telephone conversation with the attorney was Mr. Porter's last contact with the Dodrill claim, since, in accord with Nationwide policy, he was not authorized to handle negotiations with attorneys and was required to turn the Dodrill file over to an adjuster authorized to settle claims with attorneys.

The second witness, Mr. Dodrill, testified as to how the collision giving rise to his claim occurred. Over the objection of Nationwide, two photographs of Mr. Dodrill's vehicle, which Mr. Porter had not seen when evaluating the Dodrill claim, were also admitted into evidence. Mr. Dodrill identified the photographs as showing the damage sustained to the vehicle in the Phares collision. He indicated that after the accident he was taken by ambulance to Summersville Hospital, where he was x-rayed and was told by two doctors that his neck was strained. He was given a prescription for pain medication and released to go home. Thereafter, despite being in pain, he testified that he delayed going to a doctor because he felt that doctors were just taking x-rays and not helping him. At one point he also testified that he did not go to a doctor because he did not have the money to go, although on cross-examination he also testified that he had health insurance that might have paid for doctor visits. Mr. Dodrill could not remember when he was first contacted by Mr. Porter, but did acknowledge that when he was contacted by Mr. Porter, Mr. Porter was attempting to obtain information from him and wanted to know how badly hurt he was. Mr. Dodrill testified that he indicated that he was "hurt pretty bad but didn't know how bad." Mr. Dodrill recalled Mr. Porter's $1,800.00 settlement offer and also recalled another offer between $2,000.00 and $2,200.00, but did not know when that offer was made. Mr. Dodrill characterized Mr. Porter as very courteous and

polite and indicated that Mr. Porter listened to him. He also indicated that Mr. Porter never used terms like "this is the bottom dollar," "this is it," "take it or leave it," "I'll not pay you a penny more," or any other "hard-sell" statement. Mr. Dodrill also indicated that he was not ready to settle on December 11, 1987, or even talk about money until he knew how he was progressing.

The third witness, called as an expert by Mr. Dodrill, was Donald K. Bischoff, an attorney from Summersville, West Virginia. He testified that, based on his review of the documents in the case, the value of Mr. Dodrill's case was between $5,000.00 and $9,000.00 and that $2,000.00 was not a reasonable offer. He also indicated that it was reasonable for Mr. Porter not to have attempted to continue negotiations with Mr. Dodrill when Mr. Dodrill indicated that he was not ready to settle until he knew how he was progressing physically. Mr. Bischoff did not find that it was particularly unusual for an additional eight months to elapse between the time Mr. Dodrill retained an attorney and when settlement actually occurred, or that it took eight months to gather additional medical information which was obtained by sending Mr. Dodrill to a doctor for evaluation. He also testified that, while insurance companies had no right whatsoever to require a claimant, such as Mr. Dodrill, to undergo a medical examination before litigation was initiated, he had experienced and knew of instances when an insurance company requested such an examination as a part of their investigation of a claim in which no litigation had been initiated.

During the trial other evidence was also received. Over Mr. Dodrill's objection, letters from Nationwide's attorneys to another Nationwide adjuster, dated January 3, 1990, and March 21, 1990, were admitted into evidence in the trial of this case. The letters disclosed that in January, 1990, prior to the trial of the underlying damage claim in which Mr. Dodrill won a judgment of $11,386.00 against Nationwide, it had offered $4,000.00 and Mr. Dodrill had demanded $7,500.00 and that later, still before the earlier trial, when Nationwide raised its offer to $5,500.00, Mr. Dodrill had lowered his demand to $6,500.00.

During the trial of this case, Mr. Porter indicated that he was aware of the Nationwide $5,500.00 offer and that that offer was based on information developed after Mr. Porter ceased his connection with the claim. The additional information, which was apparently in Nationwide's hands when both 1990 offers were made, contained, among other things, additional wage and medical information and the report of the specialist whom Mr. Dodrill's attorney informed Mr. Porter would examine the claimant.

A letter detailing attorney fees and expenses incurred in the trial of the earlier action against Mr. Phares and Nationwide was also introduced into evidence in support of Mr. Dodrill's claim for compensatory damages in this action. The letter disclosed that $5,074.12 had been deducted from Mr. Dodrill's recovery in that action for those purposes and that he had been paid only the remaining balance of the judgment. The trial court denied Nationwide's motion to admit into evidence two documents related to an injury of Mr. Dodrill which occurred shortly after the Phares collision.

At the conclusion of the trial, the jury awarded Mr. Dodrill $5,074.12 for attorney's fees and court costs, $2,000.00 for annoyance and inconvenience, and punitive damages in the amount of $5,000.00. The total award amounted to $12,074.12.

Nationwide had moved for a directed verdict pursuant to Rule 50(a) of the West Virginia Rules of Civil Procedure, based upon the claim that the evidence was insufficient to establish a *prima facie* right of recovery under W.Va.Code § 33–11–4(9)(f). That motion and a subsequent motion for judgment notwithstanding the verdict or, in the alternative for a new trial, were denied. As previously noted, this appeal is taken from that action of the trial court. In the latter motions, Nationwide raised again the failure of the court to direct a verdict in its favor. Here, Nationwide's principal assignment of error centers around its claim that the evidence adduced during trial was insufficient to establish a *prima facie* case and support a jury verdict under W.Va.Code § 33–11–4–(9)(f). First, we state the standard for review.

In *Alkire v. First National Bank of Parsons,* 197 W.Va. 122, 475 S.E.2d 122 (1996), this Court discussed the circumstances under which evidence adduced during a jury trial would support a jury verdict in a judgment notwithstanding a verdict situation. In syllabus point 1 of that case, this Court concluded:

The standard of review recited in Syllabus Point 1 in *Mildred L.M. v. John O.F.,* 192 W.Va. 345, 452 S.E.2d 436 (1994) and in Syllabus Point 1 in *Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995), and their progeny, is clarified to read as follows: In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a denial of a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of the appellate court to reverse the circuit court and to order judgment for the appellant.

In syllabus point 2 of the same case, the Court went on to state:

In reviewing a trial court's granting of a motion for judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on the granting of a motion for judgment notwithstanding the verdict, the evidence must be view in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally sufficient to sustain the verdict, it is the obligation of the appellate court to reverse the circuit court and to order judgment for the appellant.

Essentially, the same rules apply where motions for a directed verdict are implicated. *Powell v. Time Insurance Company,* 181 W.Va. 289, 382 S.E.2d 342 (1989); and *Wager v. Sine,* 157 W.Va. 391, 201 S.E.2d 260 (1973).

Mr. Dodrill's claims in the present case were predicated upon sub-paragraphs (f) and (n) of W.Va.Code § 33–11–4(9), although the evidence adduced at trial appears to have focused only on sub-paragraph (f). The referenced portions of W.Va.Code § 33–11–4(9) provide:

(9) *Unfair claim settlement practices.—* No person shall commit or perform with such frequency as to indicate a general business practice any of the following:

\* \* \* \* \* \*

(f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

\* \* \* \* \* \*

(n) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

In *Jenkins v. J.C. Penney Casualty Insurance Company,* 167 W.Va. 597, 280 S.E.2d 252 (1981), this Court discussed in some depth the elements which must be proved to recover in a private action under W.Va.Code § 33–11–4(9).[2] Among other points, the Court stressed that a plaintiff must show more than a single violation of W.Va.Code § 33–11–4(9); the Court required that such violations of the act had to occur with such frequency as to indicate that the conduct was a general business practice of the insurance company in its dealings with claimants. Specifically, the Court stated:

We agree with the point raised by the insurance company that there appears to be a qualification to the right to recover in

---

**2.** In *State ex rel. State Farm Fire & Casualty Co. v. Madden,* 192 W.Va. 155, 451 S.E.2d 721 (1994), *Jenkins,* and the cases which followed it, were overruled insofar as they prohibited joinder of bad faith actions and underlying personal injury actions. They were not overruled insofar as they related to the issues discussed in this opinion.

a statutory suit, found in the beginning sentence of W.Va.Code, 33–11–4(9):

"No person shall commit or perform with such *frequency* as to indicate a general business practice any of the following: . . ." [Emphasis added]

\*　　\*　　\*　　\*　　\*　　\*

We conceive that proof of several breaches by an insurance company of W.Va.Code, 33–11–4(9), would be sufficient to establish the indication of a general business practice. It is possible that multiple violations of W.Va.Code, 33–11–4(9), occurring in the same claim would be sufficient, since the term "frequency" in the statute must relate not only to repetition of the same violation but to the occurrence of different violations. Proof of other violations by the same insurance company to establish the frequency issue can be obtained from other claimants and attorneys who have dealt with such company and its claims agents, or from any person who is familiar with the company's general business practice in regard to claim settlement. Such information is, of course, subject to discovery, and it appears that the Legislature intended under W.Va.Code, 33–11–4(10), to require insurance companies to maintain records on complaints filed against it.

*Id.* at 609–10, 280 S.E.2d at 259–60 (footnote omitted).

In syllabus point 3 of *Jenkins,* this Court expressed the requirement that a general business practice must be shown, as follows:

More than a single isolated violation of W.Va.Code, 33–11–4(9), must be shown in order to meet the statutory requirement of an indication of "a general business practice," which requirement must be shown in order to maintain the statutory implied cause of action.

While *Jenkins* details a means of proving a "general business practice" by showing that the same insurance company had committed the same violation of W.Va.Code § 33–11–4(9) in handling other claims involving other insureds, it does not give such guidance in cases where the plaintiff undertakes to show a "general business practice" by the conduct

of an insurance company in the handling of a single claim, other than to clearly require that more than one violation of W.Va.Code § 33–11–4(9) must be shown in all events.

This Court did briefly revisit the issue of showing multiple violations, and thus a "general business practice," in the handling of a single claim, in *Russell v. Amerisure Insurance Company,* 189 W.Va. 594, 433 S.E.2d 532 (1993). There the Court stated:

As we ruled in *Jenkins:* "More than a single isolated violation of W.Va.Code, 33–11–4(9), must be shown in order to meet the statutory requirement of an indication of 'a general business practice,' which requirement must be shown in order to maintain the statutory implied cause of action." Syl. Pt. 3, *Jenkins,* 167 W.Va. at 598, 280 S.E.2d at 253. Appellant argues unconvincingly that she has "identified and pleaded five distinct violations of W.Va. Code § 33–11–4(9)" by alleging that Amerisure violated five different subsections of West Virginia Code § 33–11–4(9). The factual basis for each of these violations is the same isolated scenario and does not suffice to represent a "general business practice."

189 W.Va. at 598, 433 S.E.2d at 536 (footnote omitted).

To instruct the jury on the applicable law, the trial court in the case before us used the following instruction:

In this case, the Plaintiff, Alton E. Dodrill, has the burden of proving, by a preponderance of the evidence, that Nationwide Insurance Company violated the Unfair Claim Settlement Practices Act by engaging in unfair claim settlement practices.

\*　　\*　　\*　　\*　　\*　　\*

The first issue you must decide deals with whether Nationwide Mutual Insurance Company violated the Unfair Claim Settlement Practices Act.

Under West Virginia law, an insurance company and its employees shall not commit, or perform with such frequency as to indicate a general business practice, the act of not attempting in good faith to effectuate prompt, fair, and equitable settle-

ments of claims in which liability has become clear.

If you find that Nationwide Mutual Insurance Company committed a violation of the Unfair Claim Settlement Practices Act, you must then determine if the violation is a general business practice of Nationwide Mutual Insurance Company.

A general [sic] practice cannot be established by a single isolated violation. Several breaches or violations of the Act must be proved to show a general business practice, even though they occurred in the same claim.

In your deliberations, you must evaluate Nationwide's conduct based upon the information available, and the cooperation or lack of cooperation of the Plaintiff up to the date of May 1988, when the Plaintiff retained counsel. In other words, was it prompt, fair, and equitable at the time?

Therefore, if you find that Alton E. Dodrill has proved, by a preponderance of the evidence, that Nationwide Mutual Insurance Company failed in good faith to effectuate a prompt, fair, and equitable settlement of his claim when liability has become reasonably clear and that such an act was a general business practice of Nationwide Mutual Insurance Company, then you should find for the Plaintiff, Alton E. Dodrill.

On the other hand, if you find that the Plaintiff failed to prove either (1) that Nationwide Mutual Insurance Company failed in good faith to effectuate a prompt, fair, and equitable settlement of his claim when liability became reasonably clear or (2) that it was a general business practice of Nationwide Mutual Insurance Company, then you should find for the Defendant, Nationwide Mutual Insurance Company.

In our view, this instruction placed the issue of general business practice squarely within the province of the jury and allowed the jury to draw from the evidence such inferences on the issue as they deemed appropriate. We note that Nationwide made no objection to this instruction other than that which they now assert here, that the evidence was insufficient. We note also that Nationwide offered no curative or more concrete alternate instruction and that the instruction is consonant with the pre-trial order stating the issues to be tried.

■ When examining the record for the sufficiency of evidence to support the verdict, we view the evidence in the light most favorable to the prevailing party. We are not concerned with how we might decide the facts in the jury's stead, nor does our review favor the inferences and conflicts in the evidence helpful to the losing party. Under those rules, the evidence shows that Mr. Dodrill was involved in the Phares collision on October 24, 1987, and that the liability of Nationwide to pay the claim was not disputed. Following the collision, Mr. Dodrill apparently participated in negotiations with Nationwide for the next two and one-half years, until at least March 31, 1990, without being able to obtain a settlement from Nationwide. Over this period, he or his counsel engaged in many contacts with representatives from Nationwide, including Mr. Porter and individuals connected with Nationwide's legal department or trial counsel. The record shows that Mr. Dodrill was in contact with Nationwide at least on November 3, 1987, December 3, 1987, December 11, 1987, March 1, 1988, May 12, 1988, January 3, 1990, and March 31, 1990. The record discloses that Nationwide made offers of $1,800.00 and $2,000.00 plus a scheduled release for future medical bills. Also, the jury was told that $2,000.00 was not a reasonable offer. The jury learned that Nationwide had made later offers of $4,000.00 and $5,500.00 on the claim after Mr. Porter turned the matter over to another adjuster. It further appears that during the negotiations the parties were very close to settlement, but Nationwide refused to settle the claim, even when the parties were only $1,000.00 apart. The jury learned that Mr. Dodrill subsequently recovered more than two times Nationwide's last offer. Specifically, the jury had before it the stipulation disclosing that Mr. Dodrill recovered $11,386.00 on the underlying claim, an amount fixed, the stipulation says, by another jury.

In addition, the jury learned that the underlying Phares claim was placed first with a Nationwide adjuster whose investigation, it

could be inferred, was limited to telephone contact with the claimant and information generated internally and from those phone conversations. The information gathered by the other Nationwide employee who settled the property damage portion of the claim was not shared with Mr. Porter. Mr. Porter's authority was rather limited and it could be inferred that he was not permitted to handle a claim worth $4,000.00, $5,500.00 or over $11,000.00 or settle a claim of that size for a sum approaching its worth. Moreover, it could be inferred that Mr. Porter was not permitted to handle claims important enough to involve legal representation of his company or the claimant. His job, as he testified, was to find out what the claimant wanted and try to settle the case within the authority given him by Nationwide, in the present case an amount which another jury had found to be less than one-fourth of the true worth of the claim. Moreover, the evidence disclosed that the company had a policy against pre-paying medical bills and other clearly ascertained amounts. The jury also heard that Nationwide did not request a medical examination at company expense when the extent of medical injuries has not been otherwise satisfactorily documented, although other insurance companies do, on occasion, request such pre-litigation medical examinations when the extent of medical injuries is not known.

The foregoing is not intended to state exhaustively the factors which may have been considered or which should have been considered or the full range of inferences the jury might properly have drawn from the facts before it. However, from our review of the entire record, we do believe that the evidence would support a conclusion that, during the negotiation process outlined above, Nationwide violated W.Va.Code § 31–11–4(9) by failing in good faith, and on numerous, separate occasions, to effectuate a prompt, fair and equitable settlement of the Dodrill claim, on which liability had become reasonably clear. We also believe that the evidence would support the conclusion that such violations occurred with such frequency during the negotiation process in the Dodrill claim that a general business practice was indicated. In reaching this conclusion, we rely, as

did the trial court below, on the applicable decisional and statutory law which we have here reviewed, the instruction given by the trial court, and the evidence in the record, taken in the light most favorable to the prevailing party below, Mr. Dodrill, assuming that all conflicts in the evidence were resolved by the jury in his favor, and after giving him the benefit of all favorable inferences which may be drawn from the facts. Having so concluded, the Court cannot find that the trial court erred in failing to direct a verdict for Nationwide or in failing to grant Nationwide's motion for a judgment notwithstanding the verdict.

In considering the case before us, we have also concluded that *Jenkins* and *Russell* do not fully articulate parameters within which the conduct of an insurance company may be adequately evaluated, in the context of the handling of a single claim, to determine or demonstrate that violations of W.Va.Code § 33–11–4(9) do or do not entail a "general business practice." We have searched for cases from other jurisdictions for guidance on the question and have located only a few cases even bearing on the point. However, the cases found do not assist us in the matter under discussion.

We perceive that the discussion of a "general.business practice" in our past cases has generally addressed the question in terms of numbers, e.g., the number of claims in which the same practice has been used, the number of violations of W.Va.Code § 33–11–4(9) shown by the evidence, and the number of scenarios. While those cases make clear that the employment of a single, particular forbidden practice in the handling of several claims can define a general business practice, there presently is no fully articulated guidance where a claim of "a general business practice" is alleged to have arisen in the handling of a single claim. As we indicated in *Russell v. Amerisure Insurance Company, supra,* an isolated scenario is not sufficient. On the other hand, applying the basic rational of *Jenkins,* separate, discrete acts or omissions, each of which constitute violations of different sub-paragraphs of W.Va.Code § 33–1–14(9), may indeed demonstrate a "general business practice" in the handling of a single

claim, the focus of which would tend to show frequent and rather general disregard for the several proscriptions separately set out in the relevant statute. Or, as may be inferred from the evidence found in the record before us, there may be a series of separate and discrete acts or omissions, indicative of the habit, custom, usage, or business policy or policies regarding the handling of a particular type or size of claim, which, if found to violate one or more of the sub-paragraphs of the subject statute, would tend to show frequent disregard of the statute. From this analysis, it also appears that in cases involving the handling of a single claim, the evidence necessary to distinguish a general business practice frequently violative of the statute from the wholly proper investigation and settlement process requires a somewhat more qualitative inquiry than is required where the same forbidden practice is found in several claims. We are mindful that the alleged misdeeds of a single employee or adjuster in a single claim would not, standing alone, define the business practices of the insurer. We perceive that the evidence adduced in a single claim case, such as is before us, should be such that the finder of fact, viewing the conduct as a whole, is able to conclude that the practices constitute multiple violations of the statute and are sufficiently pervasive or sufficiently sanctioned by the insurance company that the conduct can be considered a "general business practice" and can be distinguished by fair minds from an isolated event.

■ Accordingly, we hold that to maintain a private action based upon alleged violations of W.Va.Code § 33–11–4(9) in the settlement of a single insurance claim, the evidence should establish that the conduct in question constitutes more than a single violation of W.Va.Code § 33–11–4(9), that the violations arise from separate, discrete acts or omissions in the claim settlement, and that they arise from a habit, custom, usage, or business policy of the insurer, so that, viewing the conduct as a whole, the finder of fact is able to conclude that the practice or practices are sufficiently pervasive or sufficiently sanctioned by the insurance company that the conduct can be considered a "general business practice" and can be distinguished by fair minds from an isolated event.

We have reviewed the evidence in the case before us in light of the standards we announce today. We conclude that, under those standards, the evidence, taken in the light most favorable to the prevailing party, is sufficient to support the jury's verdict.

■ In another assignment of error, Nationwide argues that damages should not have been awarded for annoyance and inconvenience because no testimony on that issue was elicited from Mr. Dodrill. During the trial of the present case, Mr. Dodrill did offer evidence showing that, in spite of repeated contacts with Nationwide, he was unable to reach a satisfactory settlement over an almost three-year period. He also testified on several occasions that he was being treated unfairly. For example, during cross-examination he was asked: "You testified, I believe on direct, that you felt that Mr. Porter was a little bit unfair ... ?" Mr. Dodrill responded: "Very unfair, I thought."

After reviewing the record, this Court believes that a reasonable inference to be drawn from the long sequence of events leading up to Mr. Dodrill's initial law suit against Nationwide is that he did suffer inconvenience as a result of the failure of Nationwide to settle his claim, and he clearly expressed his sense that he was being treated unfairly. The Court believes that annoyance often accompanies the sense that one is being treated unfairly and that the jury, which was in a position to observe Mr. Dodrill's demeanor and tone of voice during his testimony, could reasonably have inferred that he suffered annoyance as the result of what occurred. In summary, and in view of the evidence and the inferences to be drawn from it, the Court cannot conclude that Nationwide's assignment of error relating to damages for annoyance and inconvenience is meritorious or that the trial court erred in upholding the jury's verdict on annoyance and inconvenience.

Nationwide also complains that the award of punitive damages is improper because there is no evidence of willful, malicious, and intentional conduct by Nationwide.

**14**

In *Jenkins v. J.C. Penney Casualty Insurance Company, supra,* the Court indicated in note 12 that, in an appropriate case, punitive damages could be recovered in a *Jenkins*-type action. The Court did not, however, indicate precisely what had to be shown to merit such a recovery. The trial court in the present case, without further guidance from our cases, instructed the jury:

Punitive damages are appropriate in a case where a defendant commits acts of gross fraud, malice, oppression or wanton, willful or reckless conduct; or criminal indifference to civil obligations affecting the rights of others.

If you find that Nationwide Mutual Insurance Company's conduct to be of this character, then you may award punitive damages based on the following factors:

(1) That punitive damages should bear a reasonable relationship to the harm that is likely to occur from defendant's conduct, as well as to the harm that actually has occurred.

If the defendant's actions caused or would likely cause, in a similar situation, only slight harm, the damages should be relatively small. If the harm is grievous, then the damages should be much greater.

(2) You may consider the reprehensibility of defendant's conduct. And in doing so, you should take into account how long defendant continued in its actions, whether they were aware that their actions were causing or were likely to cause harm, whether they attempted to conceal or cover up their actions or the harm caused by them, whether they often engaged in similar conduct in the past, and whether they have made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once their liability became clear to them.

Following the trial in the present case, this Court did provide additional guidance on when punitive damages are recoverable. In *Poling v. Motorists Mutual Insurance Company,* 192 W.Va. 46, 450 S.E.2d 635 (1994), an action commenced against an insurance company by a third-party injured by a tortfeasor insured by the company, this Court stated:

[W]e hold that punitive damages are recoverable in insurance bad faith cases despite the fact that there may have been a settlement of the underlying tort action. With that said, the plaintiff in this case must still show that punitive damages are appropriate in this particular case. That is, the plaintiff must show that Motorists knew Mr. Poling's claim was proper and willfully, maliciously, and intentionally delayed payment in order to attempt to obtain a less than just settlement. *Berry v. Nationwide Mut. Fire Ins. Co.,* 181 W.Va. 168, 381 S.E.2d 367 (1989).

192 W.Va. at 48–49, 450 S.E.2d at 637–38.

■ In *Berry v. Nationwide Mutual Fire Insurance Company, supra,* the case cited in *Poling,* the Court specifically stated, in syllabus point 5:

Punitive damages may be awarded to an insured if the insurer actually knew that the claim was proper and the insured can prove that it was willfully, maliciously and intentionally denied. Therefore, in such a case, it is not error for a trial court to give an instruction stating that punitive damages may be awarded.

Although the charge given by the trial court in the present case did not precisely follow the dictates of *Poling,* we believe that it essentially covered the key elements necessary for entitlement to punitive damages. We note further that the trial court's verdict form, submitted in light of its instruction, posed the issue to the jury as follows:

Did the conduct of the Defendant, in failing to attempt to effectuate a prompt, fair and equitable settlement constitute willful, malicious and intentional conduct

We find that the trial court did not commit reversible error in committing the issue of punitive damages to the jury, especially in light of the fact that the *Poling* opinion had not yet been issued. After examining the record developed, this Court also believes that the evidence and the inferences arising from it, when construed in the light most favorable to Mr. Dodrill, in accordance with the principles set forth in *Mildred L.M. v. John O.F., supra,* were sufficient to support a jury conclusion that the actions of Nation-

wide were willful, malicious, or intentional. Therefore, the Court cannot conclude that the punitive damage award should be reversed.

In addition to asserting that the evidence in this case did not support the verdict rendered by the jury, Nationwide contends that the trial court made a number of erroneous procedural rulings. The first claim is that the trial court erred in denying Nationwide's motion *in limine* to prohibit the admission of certain photographs taken at the scene of the accident.

In *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995), this Court indicated that rulings on the admissibility of evidence are generally committed to the sound discretion of the trial court and that the West Virginia Rules of Evidence and Rules of Civil Procedure give substantial discretion to the trial court in making evidentiary rulings. Specifically, in syllabus point 1, the Court stated:

> The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence and the appropriateness of a particular sanction for discovery violations are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.

Mr. Dodrill claims in the present case that the photographs in issue were offered to show the information available to Mr. Porter and to Nationwide during the settlement process. Nationwide responds that Mr. Porter had not seen the photographs when he evaluated Mr. Dodrill's case. In this Court's view, the information which was available to Nationwide reasonably did or should have impacted on Nationwide's settlement decisions, and what did or should have impacted on those settlement decisions was a factor relevant to the jury's consideration of the issues. Under such circumstances, the Court believes that the trial court did not abuse its discretion in admitting the photographs into evidence.

Another contention of Nationwide's is that the trial court erred in denying its motion *in limine* to limit any argument or inference that Mr. Porter should have caused Mr. Dodrill to undergo an independent medical examination. Nationwide argues that, under the law, it was not required to subject Mr. Dodrill to an independent medical examination and, in fact, legally could not do so. It takes the position that, given these circumstances, evidence suggesting that Nationwide violated some duty which it had to Mr. Dodrill was improper for the jury's consideration. In examining what happened relating to this assignment of error, this Court has found that, in the course of the trial, when the issue of Nationwide's not requiring Mr. Dodrill to undergo an independent medical examination arose, the trial court specifically instructed the jury as follows:

> I would instruct the jury right now that the insurance company in this case had no authority whatsoever to force Mr. Dodrill to have an independent medical examination prior to filing suit.

> And after suit is filed, the defendant would have to file a motion before the court and get court approval before an independent medical examination could be ordered.

After giving this instruction, the trial court asked Nationwide's attorney, "Does that clear it up?" Nationwide's attorney responded, "That's it; that's it. Thank you very much, Judge."

It appears that the trial court's instruction clarified the situation and, contrary to Nationwide's assertions, the trial court did not allow the jury to assume that Nationwide had some duty to require Mr. Dodrill to undergo an independent medical examination. As we have noted before, evidence was elicited at the trial that, on occasion, insurance companies request an independent examination before litigation is commenced, where the medical evidence before them is not satisfactory to them. We perceive that the relevancy of the contested evidence is clear from the record and that the trial court did not abuse its discretion in allowing the argument and re-

lated evidence, especially in light of its limiting instruction to the jury.

Nationwide also claims that the trial court erred in failing to grant a motion *in limine* regarding the applicable measure of damages in this matter. In that motion, Nationwide took the position that the jury in the underlying personal injury action awarded Mr. Dodrill more than his last demand and that the jury must, therefore, have awarded Mr. Dodrill attorney fees and court costs in that trial. Nationwide's attorney said that Mr. Dodrill's "counsel should not be allowed to argue that ... [Mr. Dodrill] is entitled to be awarded compensatory damages on the basis of the attorney fees and court costs taken out of the verdict [rendered in the personal injury trial]."

We find no merit in this assertion. In note 12 of our opinion in *Jenkins*, we addressed briefly some elements of damages recoverable in a claim of the nature before us, and we clearly sanctioned the recovery of attorney fees and costs incurred in the underlying action against a tortfeasor. Attorney fees were not properly recoverable in the underlying Phares action. Nationwide's claim that the jury in that action awarded attorney fees can only be seen as speculation. In any event, we note that the trial court in the case before us clearly instructed the jury that it was not to award Mr. Dodrill damages which were duplicative. The court said:

> The law does not permit double recovery of damages. And if you find the Plaintiff has been fully compensated for all of his injuries in the underlying action, then you should award him only the increased fees and expenses resulting from the failure to offer a prompt and fair settlement.

Next, Nationwide argues that the trial court erred in not allowing it to introduce into evidence its Exhibits Nos. 5 and 6. Exhibit No. 5 was an outpatient report from Summersville Hospital and Exhibit No. 6 was a radiology report dated October 26, 1987, relating in each case to injuries Mr. Dodrill allegedly suffered after the collision litigated in the Phares action. In this Court's view, there was legitimate doubt as to their relevancy in this claims settlement action, and, under the circumstances, this Court cannot

conclude that the trial court abused its sound discretion in denying the admission of these items or that the trial court, given the holding in *McDougal v. McCammon, supra*, erred in refusing to admit them into evidence.

■ Nationwide's next contention is that the trial court refused to give its Instructions Nos. 3, 24, and 25. Nationwide's Instruction No. 3 suggested that Mr. Dodrill had a duty to mitigate his damages in this action by seeking medical treatment.

■ The issue of injuries suffered and damages incurred by Mr. Dodrill in the collision was resolved in the Phares action. Giving greatest sway to Nationwide's argument, we understand their contention to be that had Mr. Dodrill mitigated his damages in the Phares action by going to a doctor, the disparity between what was recovered in that action and what Nationwide earlier offered would not be so great and thus, presumably, the conduct of Nationwide in the settlement negotiations would appear reasonable. Without giving attention to how persuasive such an argument might or might not be, we note that no evidence was proffered that any such medical treatment would have lessened Mr. Dodrill's pain or suffering or reduced his expenses incurred as a result of the Phares collision. Moreover, the instruction offered in no way assists the jury in understanding how any medical care would lessen Mr. Dodrill's claim to bad faith settlement damages in the case before us. If, on the other hand, Nationwide means to suggest that the instruction it offered was proper to mitigate damages in the claims settlement case before us, suffice it to say that the injuries suffered and damages incurred in the collision were simply not a proper factor in the case tried below and any such instruction would surely have confused the jury. As a consequence, the Court believes that the instruction was not supported by the evidence and was potentially somewhat confusing. We do not find that the trial court erred in refusing to give it. It is reversible error for a trial court to give an instruction which tends to mislead and confuse a jury. As stated in syllabus point 19 of *Rodgers v. Rodgers*, 184 W.Va. 82,

399 S.E.2d 664 (1990): " 'It is reversible error to give an instruction which tends to mislead and confuse the jury.' Syllabus Point 5, *Sydenstricker v. Vannoy,* 151 W.Va. 177, 150 S.E.2d 905 (1966)." *See also Koontz v. Long,* 181 W.Va. 800, 384 S.E.2d 837 (1989); and *Cross v. Trapp,* 170 W.Va. 459, 294 S.E.2d 446 (1982).

Nationwide's Instruction No. 24 related to damages recoverable in an action of this nature under W.Va.Code § 33–11–4(9). We are satisfied that the subject of damages was substantially and correctly covered by the judge's charge. Moreover, Nationwide's Instruction No. 24 ventured into a discussion of comparing the recovery received in the underlying Phares action with the amount the jury thought should have been offered by Nationwide. We can find no support in law for that portion of the proposed instruction.

Nationwide's Instruction No. 25 dealt abstractly with the nature of tort claims, fair settlements, and reasonable attempts to settle disputes regarding such claims. We are unable to discern a ground for giving this instruction as proffered.

■ The Court believes that the trial court's charge adequately covered the applicable law relating to the issues being tried. We have often made clear that it is not error for a trial court to refuse an instruction adequately covered by another instruction, and the Court believes that Nationwide's assignment relating to these instructions is without merit. *See Lenox v. McCauley,* 188 W.Va. 203, 423 S.E.2d 606 (1992); *Dowey v. Bonnell,* 181 W.Va. 101, 380 S.E.2d 453 (1989); *Willey v. Travelers Indemnity Company,* 156 W.Va. 398, 193 S.E.2d 555 (1972); and *Morgan v. Price,* 151 W.Va. 158, 150 S.E.2d 897 (1966).

■ Lastly, Nationwide claims that the trial court erred in failing to give the jury an interrogatory verdict form submitted by Nationwide. The court below substituted its own verdict form for that suggested by Nationwide. It appears to this Court that the trial court verdict form adequately inquired of the jury on the issues to be determined and properly instructed the jury with regard to the matters on which a jury verdict was required.

In *Carper v. Kanawha Banking & Trust Company,* 157 W.Va. 477, 207 S.E.2d 897 (1974), this Court held that whether a jury should be compelled to answer special interrogatories before arriving at a general verdict is a matter resting in the sound discretion of the trial court. *See also Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995), in syllabus point 8 of which the Court stated: "As a general rule, a trial court has considerable discretion in determining whether to give special verdicts and interrogatories to a jury unless it is mandated to do so by statute."

The record in this case does not demonstrate that the trial court abused its sound discretion by using its verdict form rather than the special interrogatories submitted by Nationwide.

For the reasons stated, the judgment of the Circuit Court of Nicholas County is affirmed.

Affirmed.

RECHT, Judge, sitting by temporary assignment.

WORKMAN, J., dissents and files a dissenting opinion.

WORKMAN, Justice, dissenting:

While I do not object to the majority's enunciation of what constitutes multiple violations of West Virginia Code § 33–11–4(9) [1] and the need for the fact-finder to conclude that such violative conduct is a "general business practice," the factual evidence presented by this case falls far short of bad faith [2] conduct within the meaning of the statute,

---

1. The specific subsection of West Virginia Code § 33–11–4(9) under which Mr. Dodrill brought suit was subsection (f), which states: "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."

2. "Bad faith" herein is in the nature of statutory unfair claim settlement practices, as opposed to the type of bad faith claim for failing to settle within policy limits articulated by this Court in *Shamblin v. Nationwide Mutual Insurance Co.,* 183 W.Va. 585, 396 S.E.2d 766 (1990).

and I must therefore dissent. In fact, upon reviewing the record in this case, the only honest conclusion to be reached is that, despite little evidence of residual medical problems, the Appellee, Mr. Dodrill, appears to himself have delayed settlement with Nationwide in the hope of increasing his recovery. His own attorney told the Nationwide adjuster that it would be difficult to get Mr. Dodrill to settle.

The facts of this case overwhelmingly fail to demonstrate bad faith [3] acts on the part of Nationwide. Within days of the accident, the Nationwide adjuster contacted Mr. Dodrill to discuss the nature of his injuries. Mr. Dodrill said that he had missed some work and was experiencing great pain in his neck and back but had not seen a doctor for the pain as he did not believe that it would do any good. Upon the adjuster's receipt of Mr. Dodrill's wage verification and attending physician's report, he again initiated contact via a phone call to Mr. Dodrill on December 11, 1987. During this conversation, Mr. Dodrill said he was still experiencing pain but that he didn't want to see a doctor. The adjuster advised Mr. Dodrill that if he was still experiencing pain it would be prudent to seek out medical help. During this same conversation, the adjuster offered Mr. Dodrill $1800 to settle the case. The offer was formulated based on the submitted medical bills of $217 and lost wages of $791. At the time the offer was extended, Mr. Dodrill had worked on a regular basis since two days after the accident and the submitted medical information indicated that no permanent injury was expected. Mr. Dodrill rejected the offer and did not make a counteroffer.

The Nationwide adjuster next spoke to Mr. Dodrill on March 1, 1988, at which time Mr. Dodrill indicated that he might need to see a specialist, but that he couldn't find the time to do so. The adjuster tendered a second offer of settlement for the amount of $2000 plus a scheduled release that would set aside money for future medical bills. Mr. Dodrill rejected this offer and indicated that he was going to get an attorney.

While Mr. Dodrill doesn't appear to complain about Nationwide's conduct after he obtained an attorney in May of 1988, the record indicates that Nationwide made an offer to settle the case for $4,000 in January 1990, to which Mr. Dodrill counteroffered $7500. Before trial, Nationwide increased its offer to $5500 and Mr. Dodrill counter offered to settle for $6500.

The only evidence upon which the majority appears to rely to support its conclusion that a general business practice existed sufficient to constitute statutory bad faith practices is Nationwide's practice of not prepaying medical bills and other fixed costs, the failure to reach a settlement between when the accident occurred and the resulting jury verdict, and Nationwide's use of a two-tiered approach with regard to handling pre- and post-litigation claims. Regarding the lapse in time, it is fair to presume that the two-and-a-half-year period between the date of the accident and the trial date is attributable to a variety of factors, including the typical delay experienced in litigation. What the majority totally overlooks is the role Mr. Dodrill himself played in delaying settlement. Mr. Dodrill repeatedly delayed in seeking medical treatment and he failed to make any demand or counteroffers of settlement until he was represented by an attorney.

The majority appears to fault Nationwide for using adjusters to settle minor claims before litigation. This is clearly a business practice that they are entitled to engage in, provided they do so in good faith. Mr. Porter, the Nationwide adjuster, appears to have performed his job in a diligent fashion. The worst that the majority can say of him is that perhaps he didn't suggest that Mr. Dodrill see a doctor during the very first telephone conversation that ensued between Mr. Dodrill and Mr. Porter. But the record indicates that Mr. Porter, during the second or third telephone conversation, actively encouraged Mr. Dodrill to seek medical treatment. Furthermore, he initiated contact with Mr. Dodrill on several occasions seeking to negotiate a settlement. In reality, what the majority

---

**3.** No statutory guidance is provided regarding what acts constitute bad faith sufficient to assert a claim under West Virginia Code § 33–11–4–

(9)(f). Similarly, no case law guidance has been provided regarding this statutory concept.

appears to dislike is the two-tiered approach of Nationwide to first rely on a non-legal individual such as Mr. Porter to attempt to settle claims and then to shift to a different employee upon the instigation of litigation. I fail to see a bad faith practice arising from this two-tiered approach. Such an approach makes good sense and may even have been calculated to more effectively bring quicker resolution to small claims.

The fact that a settlement was not reached during the period between the accident and the trial cannot be solely attributed to Nationwide. Mr. Dodrill shares a percentage of responsibility with regard to the failure to reach a settlement. Mr. Dodrill testified that at the time Nationwide extended the $2,000 plus future medicals offer, he thought $2,500 plus lost wages might be a fair offer and yet he never communicated this information to Nationwide. Had he done so, the case may have been settled in March of 1988.

While the majority seems to believe the first jury's award of $11,386, an amount twice what Nationwide last offered, is proof of unfair settlement, I cannot reach the same conclusion. Various factors, including Mr. Dodrill's apparent lack of sophistication in business matters, his age, and occupation, are likely to have influenced the jury's award. Thus, to look at the award itself as prima facie evidence of bad faith is fallacious. Furthermore, the nature of the claim was the alleged failure to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

The facts of this case are typical of any situation in which one side is attempting to increase its potential settlement and the other side is trying to keep the settlement to a lower figure in a legitimate manner. Quite simply, Mr. Dodrill does not present one scintilla of evidence sufficient to demonstrate either that Nationwide had a general business practices of bad faith, or that they in any way acted in bad faith under the facts of this case.