519 S.E.2d 843

**Lucille ROBERTSON and Kelly Gleockler, Plaintiffs Below, Appellees,**

v.

**OPEQUON MOTORS, INC., A West Virginia Corporation; and Ellen Parsons, Individually and as President of Defendant Corporation, Defendants Below, Appellants.**

No. 25331.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 26, 1999.

Decided June 17, 1999.

David M. Hammer, Esquire, Robert J. Schiavoni, Esquire, Hammer, Ferretti & Schiavoni, Martinsburg, West Virginia, Attorneys for Appellees.

Fred F. Holroyd, Esquire, Tom Price, Esquire, Holroyd, Yost & Evans, Charleston, West Virginia, Attorneys for Appellants.

PER CURIAM:

The appellant and defendant below, Opequon Motors, Inc., is a car dealership located in Martinsburg, West Virginia, selling new and used vehicles to the general public. The appellant and defendant below, Ellen Parsons, is the president and majority owner of the dealership.[1] Opequon Motors hired salespeople to sell its vehicles and agreed to compensate these salespeople by means of a commission on the sale of each vehicle. These commissioned salespeople are the appellees, plaintiffs below, who brought suit for violations of West Virginia Code § 21–5–1 et seq., also known as the Wage Payment and Collection Act ("the Act"). The plaintiffs prevailed on their claims, and for reasons set forth below, we affirm.

## I.

### Factual Background

The appellees, plaintiffs below, filed suit in March of 1996, complaining that Opequon Motors and Mrs. Parsons had engaged in illegal pay practices that violated the Act. The Circuit Court of Berkeley County certified the employees' claim as a class action on June 4, 1997, and conducted a jury trial in August of 1997.

At trial, the court considered the employees' charges, which may be summarized as two tort counts and five counts arising under the Act. The counts asserted under the Act, discussed in greater detail, infra, consisted of three involving the way in which the dealership calculated commissions, one concerning vacation pay, and one concerning holiday pay.

In the counts concerning the calculation of commissions, the employees argued that the dealership illegally reduced the amounts payable to the employees in three distinct ways: (1) by making deductions for repairs made to a vehicle after a sale; (2) by making deductions for costs associated with a customer's use of a credit card when purchasing a vehicle; and (3) by making arbitrary additions to the dealership's alleged "cost" of a vehicle, thereby reducing the "profit" on which the employees' commissions were calculated.

The court below directed a verdict in favor of the dealership on the tort claims and denied the employees' attempt to amend their complaint at trial to include a charge of fraud, but directed a verdict in favor of the employees on the counts involving repair costs, credit card costs, and vacation pay.[2] The court then bifurcated the issues of liability and damages, and allowed the jury to consider the dealership's liability on the remaining counts, which concerned the calculation of the "profit" on each vehicle and the matter of holiday pay. The jury found in favor of the employees on each of these counts.

The judge ordered the appointment of a special master to determine the exact amount of damages owed to each plaintiff, and ordered the defendants to pay the plain-

---

1. Although both Mrs. Parsons and Opequon Motors, Inc. were defendants in the action below, for the sake of brevity and clarity, this opinion will sometimes refer to them jointly as "the dealership."

2. The employees assert error in the denial of their tort claims by the lower court. Because we affirm the lower court's decision, in which the employees have substantially prevailed, we do not address the issue of the denial of the tort claims in this opinion.

tiffs' attorneys' fees and costs. The defendants made a timely motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The judge denied this motion, and defendants now appeal.

## II.

### Standard of Review

Today litigants should employ the phrase "judgment as a matter of law" in place of the phrases "directed verdict" and "judgment notwithstanding the verdict." For the sake of consistency, and because the rulings below occurred before the amendment of Rule 50 of the *West Virginia Rules of Civil Procedure*,[3] this opinion makes use of the old terminology. Because the case *sub judice* involves the lower court's rulings on both motions for directed verdict and for judgment notwithstanding the verdict, we are faced with seemingly divergent standards of review.

■■■■ We first address the standard for the counts presented to the jury. Litigants have frequently asked this Court to review the denial of motions for judgment notwithstanding the verdict,[4] and this Court has made clear that such litigants bear a strong burden when seeking to overturn the judgment of a trial court.

In reviewing a trial court's ruling on a motion for a judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a motion for a judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of this Court to reverse the cir-

cuit court and to order judgment for the appellant.

Syllabus Point 1, *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 452 S.E.2d 436 (1994). *See also, Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995); *Alkire v. First National Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996); *Dodrill v. Nationwide Mutual Insurance Co.*, 201 W.Va. 1, 491 S.E.2d 1 (1996); *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997).

However, we do not reach that conclusion in our review of the case below. We find that the plaintiffs met their burden. As stated in *Barefoot, supra,* a circuit court must examine the evidence in the light most favorable to the nonmovant, and may grant a motion for judgment notwithstanding the verdict only if "it determines the evidence could lead a reasonable person to only one conclusion favorable to the movant." *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 482, 457 S.E.2d 152, 159 (1995)(citing *Powell v. Time Ins. Co.*, 181 W.Va. 289, 382 S.E.2d 342 (1989)). We went on to state in *Barefoot* that:

> Thus, a circuit court's denial of a motion under Rule 50 of the Rules of Civil Procedure will be reversed only if the facts and inferences point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not reach a verdict against the movant.

*Barefoot v. Sundale Nursing Home, id.* As set forth with greater particularity, *infra,* we find that the defendants, the movants in the case below, fell short of this exacting standard.

But before addressing the jury's verdict, we must discuss the standard of review appropriate for a directed verdict at the time the case before us was decided. In addition to the jury's determination, the trial court

---

**3.** Effective April 6, 1998, Rule 50 of the *West Virginia Rules of Civil Procedure* changed to mirror a modification of the *Federal Rules of Civil Procedure. See Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 482 n. 7, 457 S.E.2d 152, 159 n. 7 (1995), in which this Court noted that "[t]he amendment did not ... affect either the standard by which a trial judge reviews motions

under the rule or the standard by which an appellate court reviews a trial court's ruling."

**4.** Once known as motions for judgment *non obstante veredicto,* motions for judgment notwithstanding the verdict are now considered motions for judgment as a matter of law. *See* note 3, *supra.*

directed a verdict in favor of the plaintiffs on three counts, and denied the defendants' motions for directed verdict on other counts.

Although we have articulated somewhat different standards of review for motions for judgment notwithstanding the verdict as opposed to motions for directed verdict,[5] we have recently noted a narrowing of that distinction. In footnote six of *Barefoot* we explained:

> The standard for granting a judgment notwithstanding the verdict is the same as for a directed verdict, i.e., after considering the evidence in the light most favorable to the nonmovant, only one reasonable verdict is possible. *Huffman v. Appalachian Power Co.,* 187 W.Va. 1, 415 S.E.2d 145 (1991); Fleming James, Jr., Geoffrey C. Hazard, Jr., & John Leubsdorf, *Civil Procedure* § 7.30 at 406–07 (4th ed.1992). Under this standard, a judgment notwithstanding the verdict should be denied if the evidence is conflicting or is insufficient to establish the movant's case.

*Barefoot v. Sundale Nursing Home,* note 6, 193 W.Va. 475, 481–82, 457 S.E.2d 152, 158–59 (1995).

We also discussed the convergence of these two standards of review in *Dodrill v. Nationwide Mutual Insurance Co.,* 201 W.Va. 1, 491 S.E.2d 1 (1996). After a discussion of motions for judgment notwithstanding the verdict and a citation to the first syllabus point of *Mildred L.M. v. John O.F.,* 192 W.Va. 345, 452 S.E.2d 436 (1994), *supra,* we stated that "[e]ssentially, the same rules apply where motions for a directed verdict are implicated." *Dodrill* at 9, 491 S.E.2d at 9. We confirmed this sentiment with the same language in *Tudor v. Charleston Area Medical Center, Inc.,* 203 W.Va. 111, 122, 506 S.E.2d 554, 565 (1997).

. Bearing in mind the fast-disappearing distinction between motions for judgment notwithstanding the verdict and motions for directed verdict, we turn to the decision below.

**5.** *See, e.g., Brannon v. Riffle,* 197 W.Va. 97, 475 S.E.2d 97 (1996).

## III.

### The Jury Verdict

■ The two counts presented to the jury were based upon violations of the Act. This Court has made clear that the Wage Payment and Collection Act was created for the benefit of employees, who may often be at a disadvantage when dealing with their employers. "The West Virginia Wage Payment and Collection Act is remedial legislation designed to protect working people and assist them in the collection of compensation wrongly withheld." Syl. Pt. 3, *Jones v. Tri–County Growers, Inc.,* 179 W.Va. 218, 366 S.E.2d 726 (1988)(citing Syllabus, *Mullins v. Venable,* 171 W.Va. 92, 297 S.E.2d 866 (1982)).

■ Equally clear is the right of an employee to recover costs, if he or she prevails under the Act. "An employee who succeeds in enforcing a claim under W. Va.Code Chapter 21, article 5 should ordinarily recover costs, including reasonable attorney fees unless special circumstances render such an award unjust." Syl. Pt. 3 *Farley v. Zapata Coal Corp.,* 167 W.Va. 630, 281 S.E.2d 238 (1981).

### A.

### Holiday Pay

■ One question posed to the jury was whether or not the dealership's failure to pay holiday pay to its employees violated the Act. The dealership's employment policy listed various days that would be observed as holidays, when the employees could stay home, but would still be compensated as though they had been present. For commissioned employees, the policy provided that holiday pay would be determined based upon the draw amount that employee received per day.

The Act contains no requirement that an employer provide so-called "holiday pay" to employees. However, "W. Va.Code, 21–5–3, requires an employer to settle with all employees every two weeks and 'pay them the wages due.'"[6] The Act defines "wages" to

**6.** W. Va.Code § 21–5–3 (1979) states in pertinent part:

mean all " 'accrued fringe benefits capable of calculation and payable directly to an employee[.]' W. Va.Code, 21–5–1(c)." *Lowe v. Imperial Colliery Co.*, 180 W.Va. 518, n. 2, 377 S.E.2d 652, n. 2 (1988).

The Act clearly includes holiday pay in its definition of "fringe benefits," stating that:

The term "fringe benefits" means any benefit provided an employee or group of employees by an employer, or which is required by law, and includes regular vacation, graduated vacation, floating vacation, holidays, sick leave, personal leave, production incentive bonuses, sickness and accident benefits and benefits relating to medical and pension coverage.

W. Va.Code § 21–5–1(l) (1987).

■ Although the Act does not require Opequon Motors to pay holiday pay to its employees, it does require the dealership to pay all "accrued fringe benefits capable of calculation." Because the dealership has, in its own handbook, established holiday pay as a fringe benefit, the Act demands that the dealership honor its agreement and pay its employees the holiday pay they have earned.[7]

The dealership maintained that it did indeed pay holiday pay to its employees, and the employees offered evidence to the contrary. The jury had this evidence before it, and found in favor of the employees. In Syl. pt. 1 of *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 452 S.E.2d 436 (1994), we stated that our "task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below." Viewing the jury's decision through this lens, as we must, we find the lower court's denial of the motion for judgment notwithstanding the verdict was correct.

## B.

### Calculation of Gross Profit

■ The employees also alleged that the dealership violated the Act in the way that it calculated the gross profit on the sale of each vehicle. This gross-profit amount was the key figure that determined the employees' compensation. The dealership agreed to pay its salespeople either 25 percent or 30 percent of the gross profit on the sale of each vehicle. Plaintiffs testified that they understood "gross profit" to be the sales price of the car, minus the dealership's cost of purchasing the car and preparing it for sale. This latter figure may be referred to as the "cost basis" of the car, or in the vernacular, what the dealership "had in the car."

The jury heard evidence, complicated by a blizzard of car-industry jargon, that the dealership made arbitrary increases to this cost basis that had nothing to do with any actual costs incurred by the dealership, or had no direct relationship to a car sold by one of the salespeople. These arbitrary increases had the effect of reducing the "profit" in a given vehicle, thereby reducing the commission paid to the employees, and increasing the money retained by the dealership.[8] Essen-

---

Every person, firm or corporation doing business in this State, except railroad companies as provided in section one of this article, shall settle with its employees at least once in every two weeks, unless otherwise provided by special agreement, and pay them the wages due, less authorized deductions and authorized wage assignments, for their work or services in lawful money of the United States . . . .

7. We have recently held that it is the employment agreement between employer and employee that determines "whether fringe benefits have then accrued, are capable of calculation and payable directly to an employee so as to be included in the term 'wages.' " *Meadows v. Wal–Mart Stores, Inc.*, — W.Va. —, — S.E.2d —, slip op. at 28, 1999 WL 381815 (No. 25325, June 9, 1999). However, because the arrangement regarding holiday pay *was* determined by the employee

handbook, which the dealership then violated, our holding is still in accord with *Meadows*.

8. In some cases, management employees of the dealership would add a sum to the "cost" and justify it by adding their initials. These arbitrary increases were referred to generically as "Pacs," the subspecies of which included such things as "RLB's" and "Ms. P's," which were simply the initials of the managers. In other cases, the dealership merely "bumped up" the "cost" of a car without explanation. The dealership also marked up the cost of any labor or parts used in the repair of a vehicle, above the level the dealership would have charged a member of the general public. In some cases, the dealership created and charged an internal "warranty fee" to cover the potential future cost of repairing a vehicle shortly after a sale, but then still deducted from the gross profit any costs involved in a later repair.

tially, the plaintiffs argued that the dealership constantly changed their rate of pay without notice.

■ Though the Act does not establish a particular rate of pay, it does require an employer to notify an employee of the rate of pay, and of any changes to that rate, to spare workers from trying to hit an ever-moving target. "Every person, firm and corporation shall: (1) Notify his employees in writing, at the time of hiring of the rate of pay, and of the day, hour, and place of payment. (2) Notify his employees in writing, or through a posted notice maintained in a place accessible to his employees of any changes in the arrangements specified above prior to the time of such changes." W. Va.Code § 21–5–9 (1975).[9]

■ Both sides presented evidence to the jury describing the way the dealership calculated commissions, and the jury found that the above-mentioned practices violated the Act. As this Court recently affirmed, we may not discard casually the finding of a jury. " ' "An appellate court will not set aside the verdict of a jury, founded on conflicting testimony and approved by the trial court, unless the verdict is against the plain preponderance of the evidence." Point 2, Syllabus, *Stephens v. Bartlett,* 118 W.Va. 421, [191 S.E. 550 (1937) ].' Syl. pt. 1, *Walker v. Monongahela Power Co.,* 147 W.Va. 825, 131 S.E.2d 736 (1963)." Syl. Pt. 1, *Kessel v. Leavitt,* 204 W.Va. 95, 511 S.E.2d 720 (1998).

Again, because we fail to see how "the evidence could lead a reasonable person to only one conclusion favorable to the movant," *Barefoot, supra,* we find that the circuit court was correct in denying appellants' motion for

judgment notwithstanding the verdict on this count.

### IV.

*The Court's Directed Verdict*

#### A.

*Assignment of Wages*

■ The court below found as a matter of law that certain practices of the dealership were essentially illegal assignments of wages in violation of the Act. Among other remedial provisions, the Act limits the way an employee may assign part of his or her wages:

> No assignment of or order for future wages shall be valid for a period exceeding one year from the date of such assignment or order. Such assignment or order shall be acknowledged by the party making the same before a notary public or other officer authorized to take acknowledgments, and such order or assignment shall specify thereon the total amount due and collectible by virtue of the same and three fourths of the periodical earnings or wages of the assignor shall at all times be exempt from such assignment or order and no assignment or order shall be valid which does not so state upon its face.

W. Va.Code § 21–5–3 (1979).

This Court has long been aware of the potential problems posed by wage assignments, which in days past often took the form of credit accounts at the company store. This Court in *Western v. Buffalo Min. Co.,* 162 W.Va. 543, 251 S.E.2d 501(1979), recognized that the Wage Payment and Collection Act and its forbearers were drafted, in part,

---

9. The full text of this section reads as follows:

> Every person, firm and corporation shall:
> (1) Notify his employees in writing, at the time of hiring of the rate of pay, and of the day, hour, and place of payment.
> (2) Notify his employees in writing, or through a posted notice maintained in a place accessible to his employees of any changes in the arrangements specified above prior to the time of such changes.
> (3) Make available to his employees in writing or through a posted notice maintained in a place accessible to his employees, employment practices and policies with regard to vacation pay, sick leave, and comparable matters.

> (4) Furnish each employee with an itemized statement of deductions made from his wages for each pay period such deductions are made.
> (5) Keep posted in a place accessible to his employees an abstract of this article furnished by the commissioner, and
> (6) Make such records of the persons employed by him, including wage and hour records, preserve such records for such periods of time, and make such reports therefrom to the commissioner, as the commissioner shall prescribe by regulation as necessary or appropriate for the enforcement of the provisions of this article.

W. Va.Code § 21–5–9 (1975).

to rein-in the often pernicious use of wage assignments to reduce the pay of workers:

> Both *Atkins v. Grey Eagle Coal Co.*, 76 W.Va. 27, 84 S.E. 906 (1915), and the later case of *Holliday v. Elkhorn–Piney Coal Mining Co.*, 102 W.Va. 147, 134 S.E. 736 (1926), *dealt with earlier versions of the statute,* which had provisions requiring employers who paid wages in scrip or tokens to redeem the same in lawful money.

*Western, supra* (emphasis added). Indeed, in examining the earlier case of *Atkins v. Grey Eagle Coal Co.*, we see that the reasons for regulating assignments of wages are nearly timeless. Speaking of the labor and civil unrest of the period, this Court pointed to illegal assignments of wages as a serious social problem:

> Some have taken the position that payment of wages by persons or corporations to their employés is a matter of vital concern to the general public, and that it is therefore within the power of the Legislature to prescribe the mode of payment. *Hancock v. Yaden, supra* [121 Ind. 366, 23 N.E. 253, 6 L.R.A. 576, 16 Am. St. Rep. 396]; *[Knoxville] Iron Co. v. Harbison, supra* [183 U.S. 13, 22 S.Ct. 1, 46 L.Ed. 55]. Such doubtless was the view, and, in our judgment, not an erroneous one, that prompted the enactment of the statute now being considered. Its purpose evidently was the elimination of one of the prime motives or causes alleged for the unfortunately prevalent and frequently recurring labor disputes and disturbances that have recently grievously afflicted this and other states, resulting in incalculable loss alike to employer and employé.

*Atkins v. Grey Eagle Coal Co.*, 76 W.Va. 27, 84 S.E. 906 (1915).

The court below found that the dealership violated the Act by withholding from employees' checks any costs associated with a customer's use of a credit card.[10] The court also found that the dealership illegally deducted sums from employees' paychecks for repairs made to cars that the employees had sold.[11] Plaintiffs never executed valid wage assignments for these charges as required by the Act.

■ The dealership argues that the deductions for credit card sales are not wage assignments, but instead reflect a calculation of the commission. We agree with the trial court and reject this argument. We have stated before that the Act demands strict adherence:

> The history of the Code provisions on wage assignments shows a deliberate, legislative intent to allow assignment of wages if, and only if, certain specified conditions are met. From the initial provisions allowing unfettered assignment of wages, the legislature has changed the law of West Virginia to permit only limited assignments, and then only when clearly defined legislative formalities are observed.

*Jones v. Tri–County Growers, Inc.*, 179 W.Va. 218, 222, 366 S.E.2d 726, 730 (1988). We went on underline the importance of strict compliance: "Based on the legislative history of the Wage Payment and Collection Act, W. Va.Code, 21–5–1 *et seq.* [1979], compliance with all requirements of the Act is mandatory when assigning an employee's wages." *Id.* at Syl. Pt. 4.

The Act does allow certain specific deductions to be made from employees' wages without the need for a properly executed assignment .[12] However, because we agree

---

**10.** Plaintiffs testified the dealership allowed or disallowed a customer's use of a credit card, and that often employees did not know a credit card was used until the deductions appeared on their pay stubs. Also, the dealership passed the entire charge directly on to the employees, instead of just adding the charge to the car's cost basis. Often this charge would exceed the entire commission earned by an employee on a sale, leaving the employee in the perverse situation of owing the dealership money after selling a car to a customer.

**11.** Plaintiffs testified the dealership made repairs to vehicles after a customer had taken delivery of a vehicle. The dealership also marked up the cost of repairs, "billing" a commissioned sales employee more for a repair made on a car he or she sold than the dealership would charge the general public for the same repair.

**12.** W. Va.Code § 21–5–1(g) (1987) states that: "[t]he term 'deductions' includes amounts required by law to be withheld, and amounts authorized for union or club dues, pension plans,

with the trial court that deductions made by Opequon Motors for credit card sales or automotive repairs do not fall within the narrow exceptions carved out by the Legislature, and we agree "that only one reasonable verdict is possible" *Barefoot, supra,* we must affirm the lower court's grant of a directed verdict on these counts.

## B.

### *Vacation Pay*

 Finally, plaintiffs below argued that the dealership failed to pay them their vacation pay in violation of the Act.[13] The Act does not demand that an employer offer vacation pay. However, if an employer offers paid vacation, the Act requires an employer to pay it when an employee has earned it under the terms of the employment agreement. Vacation pay is included in the statutory definition of "fringe benefits" provided by the Act:

> The term "fringe benefits" means any benefit provided an employee or group of employees by an employer, or which is required by law, and includes regular vacation, graduated vacation, floating vacation, holidays, sick leave, personal leave, production incentive bonuses, sickness and accident benefits and benefits relating to medical and pension coverage.

W. Va.Code § 21–5–1(l) (1987). As discussed *supra,* the Code makes clear that "fringe benefits" are to be considered wages once the employee has earned a right to them:

> The term "wages" means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other

basis of calculation. As used in sections four, five, eight-a, ten and twelve of this article, the term "wages" shall also include then accrued fringe benefits capable of calculation and payable directly to an employee: Provided, That nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his employees which does not contradict the provisions of this article.

W. Va.Code § 21–5–1(c) (1987). The question before the circuit court, and that which is now before us, is whether the dealership's manner of handling paid employee vacation days satisfied the requirement of the Act.

The employees took vacation days as they were entitled to under the terms of their agreement with the dealership. However, the dealership did not pay them for the days taken at the end of the respective pay period, but delayed payment until February 15 of the following year. This is a clear violation of the Act.[14]

The Act demands that an employer pay as wages "then accrued fringe benefits capable of calculation and payable directly to an employee." W. Va.Code § 21–5–1(c) (1987). If, for example, one takes a vacation day, a fringe benefit, on Thursday, July 25, the right to do so must have accrued by that date, and the amount of compensation clearly is capable of calculation. Therefore, we concur with the trial court that any jury presented with this issue would find that the dealership's vacation policy violates the Wage Payment and Collection Act, and accordingly, affirm.

---

payroll savings plans, credit unions, charities and hospitalization and medical insurance."

**13.** The dealership's employee manual provided that employees would earn a certain number of vacation days per year, and, for commissioned employees, the amount of pay for a vacation day was determined by the employee's "draw" amount. Employees taking vacation were not paid at the time they took a vacation day, but were to be compensated for any days taken in a given year on February 15 of the following year. If they quit before that time, they would forfeit their vacation pay. Thus, if an employee took

two vacation days at the end of July 1992, for example, the dealership would have subtracted two days of "draw" compensation from the July paycheck. The employee would not receive compensation for these two days until February 15, 1993, and even then, only if still employed by the dealership.

**14.** Because we feel that an employee who has been permitted to take a vacation day can safely presume that a day taken is, *a fortiori* a day "accrued," our holding in this regard is still in harmony with our recent decision in *Meadows v. Wal–Mart Stores, Inc., see* n. 7, *supra.*

## V.

### Conclusion

For the reasons set forth above, we find that the Circuit Court of Berkeley County was correct in denying appellants' motion for judgment notwithstanding the verdict and appellants' motions for directed verdict, and was also correct in granting appellees' motions for directed verdict. Accordingly, we affirm, and we direct the court to proceed with its determination of the damages that should be awarded to the various plaintiffs. In view of the fact that we find the appellants' assignment of error to be without merit, we also note the lower court's award of attorneys' fees and costs to the plaintiffs, and affirm.

Affirmed.