**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-1256**

DAVID GREGORY,

              Plaintiff – Appellee,

      v.

FOREST RIVER, INCORPORATED, a foreign corporation,

              Defendant – Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg.  John Preston Bailey, Chief District Judge.  (3:08-cv-00073-JPB-JES)

Argued:  December 2, 2009      Decided:  March 10, 2010

Before TRAXLER, Chief Judge, and SHEDD and DAVIS, Circuit Judges.

Affirmed in part, reversed in part, and remanded by unpublished opinion.  Judge Shedd wrote the opinion, in which Chief Judge Traxler joined. Judge Davis wrote a separate opinion concurring in part and dissenting in part.

Rodney Lloyd Bean, STEPTOE & JOHNSON, LLP, Morgantown, West Virginia, for Appellant.  Robert J. Schiavoni, HAMMER, FERRETTI & SCHIAVONI, Martinsburg, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

David Gregory was employed by Forest River, Inc. ("FRI") as a commissioned salesperson from 2002 until July 2007, when he was terminated. After his termination, he brought this action alleging that FRI violated the West Virginia Wage Payment and Collection Act ("WPCA"), W.Va. Code §§ 21-5-1 et seq., by failing to pay him all commissions due in a timely manner. On the parties' cross motions for summary judgment, the district court granted Gregory's motion and denied FRI's motion, and awarded him damages in the amount of $105,095.13 (plus prejudgment interest). FRI now appeals, arguing that the court erred in concluding that the WPCA is applicable and, alternatively, that it violated the WPCA. For the following reasons, we affirm in part, reverse in part, and remand this case for further proceedings consistent with this opinion.

I

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

2

one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). We review the district court's order granting summary judgment de novo. Jennings v. U.N.C., 482 F.3d 686, 694 (4th Cir. 2007) (en banc). In doing so, we generally must view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Id. at 380 (quoting Fed. R. Civ. P. 56(c)).

Although "an employer is free to set the terms and conditions of employment and compensation," Meadows v. Wal-Mart Stores, Inc., 530 S.E.2d 676, 689 (W.Va. 1999), it "must pay earned wages to its employees," Britner v. Medical Security Card, Inc., 489 S.E.2d 734, 737 (W.Va. 1997). Being "remedial in nature," the WPCA's purpose "is to protect working people and assist them in the collection of compensation wrongly withheld." Meadows, 530 S.E.2d at 686. Accordingly, it must be construed "liberally so as to furnish and accomplish all the purposes intended." Id. at 688 (citation and internal quotation marks omitted). Nonetheless, like other statutes, it must not be construed so as to produce an absurd result. Legg v. Johnson, Simmerman & Broughton, L.C., 576 S.E.2d 532, 538 (W.Va. 2002).

3

The WPCA applies to (among others) corporations that are "doing business" in West Virginia, which means "having employees actively engaged in the intended principal activity of the . . . corporation in West Virginia." W.Va. Code § 21-5-1(n). It "does not establish a particular rate of pay," Robertson v. Opequon Motors, Inc., 519 S.E.2d 843, 849 (W.Va. 1999); instead, it "controls the manner in which employees in West Virginia are paid wages," and it imposes on employers "an obligation to pay employees' wages in a timely manner." Gress v. Petersburg Foods, LLC, 592 S.E.2d 811, 814 (W.Va. 2003). Pertinent to this case, the WPCA requires a corporation to pay its discharged employee's wages (which includes commissions) in full within 72 hours, see W.Va. Code §§ 21-5-1(c), 21-5-4(b), and a corporation that fails to adhere to this requirement "shall, in addition to the amount which was unpaid when due, be liable to the employee for three times that unpaid amount as liquidated damages," W.Va. Code § 21-5-4(e).[1] An employer cannot contravene any WPCA provision by private agreement. See W.Va. Code § 21-5-10.

---

[1] The Supreme Court of Appeals of West Virginia has stated that the WPCA "has long confounded attorneys and courts alike." Meadows, 530 S.E.2d at 687. We note in this regard that the phrase "doing business in this state" appears in § 21-5-3(a), which generally requires wages to be paid every two weeks, but it does not appear in § 21-5-4(b), which requires post-discharge wages to be paid within 72 hours of the discharge. Despite the omission of the phrase from § 21-5-4(b), we believe that the section must be read as if the language is included therein; (Continued)

4

FRI, which is headquartered in Elkhart, Indiana, manufactures and sells worldwide a variety of products, including recreational vehicles, campers, cargo trailers, commercial vehicles, boats, buses, and manufactured houses. In 1996, FRI established a "Commission Payment Policy" ("the CPP") which provides:

> Commissions will be paid only on units that have been invoiced for the current month.
>
> Commissions will be paid no later than 30 days after the close of the month.
>
> Any units in the process of being credited and re-billed will be paid in the month when the final invoice is processed.
>
> If a sales person leaves the employment of Forest River, they will be paid 50% of any order that is logged in and not yet invoiced. Forest River reserves the right to hold this last check until the final unit is invoiced to the original dealer. If for some reason the order does not go to the original dealer, then no commission will be paid on that order.
>
> Also, Forest River will hold this last check to assure that any prior commission-paid units are not returned. If any units are returned, the original commission paid will be deducted [from] this last check.

---

otherwise, the statute would lead to the absurd result that only employers "doing business" in West Virginia must pay wages to current employees on a biweekly basis but any employer must pay wages within 72 hours of terminating an employee.

J.A. 116. FRI amended the CPP in 2005 by specifying: "[A]ll commission will be paid on shipped units at the end of every month. No longer will commission be paid on invoicing." J.A. 118.

FRI hired Gregory as a fulltime salesperson in 2002. At that time, he lived in Indiana, and his sales territory included several eastern states (including West Virginia) and part of Canada. With FRI's approval, he moved to West Virginia in 2004 and continued to service the same sales territory, working out of his home. Gregory was aware of and signed a copy of the unmodified CPP during his employment.

In December 2006, FRI circulated a memorandum ("the pay-date memo") to its commissioned salespeople stating that the company's "goal" continued to be paying commissions on the third Friday after month-end. FRI set forth the 2007 commission pay schedule in this memorandum.

FRI terminated Gregory's employment on July 13, 2007. At that time, FRI was paying him commission calculated at 1.7% of his sales. Pursuant to the pay-date memo, FRI paid Gregory his June commission as scheduled on July 20, 2007.[2] Thereafter, FRI paid Gregory commissions for the months of July-November ("the

---

[2] Gregory was allowed to take a $1,000 weekly draw that was offset by his commissions. On July 13 and 20, Gregory was paid his weekly draw.

post-discharge commissions") on the dates scheduled in the pay-date memo; thus, FRI paid Gregory commissions on August 17 (July commission), September 21 (August commission), October 19 (September commission), November 16 (October commission), and December 21 (November commission). Pursuant to the CPP, FRI reduced the post-discharge commissions by 50%.

In this lawsuit, Gregory does not appear to contest the fact that he was aware of FRI's policies or that he was paid all commissions due him under the terms of FRI's payment policies. Rather, he contends that the policies themselves violate the WPCA regarding the timing and amount. Ruling on the arguments presented in the parties' summary judgment motions, the district court concluded that (1) the WPCA applies to Gregory's discharge and (2) notwithstanding its payment policies, FRI violated the WPCA by failing to pay Gregory the full amount of his commissions in a timely manner. Based on these rulings, the court awarded Gregory damages in the amount of $105,095.13 (plus prejudgment interest).

The court broke the damages total into two parts. The first part consists of $30,137.13 in liquidated damages for Gregory's June commissions, which represents three times the amount of his full June commissions. The second part consists of $74,958 in unpaid commissions and liquidated damages for the post-discharge commissions. As to this second group, the court

7

concluded that FRI was not entitled to reduce the post-discharge commissions by 50% (as it had done pursuant to the CPP); further, the court noted that although the post-discharge commissions were arguably due within 72 hours of Gregory's discharge, they were due in any event (under FRI's method of calculation) within 72 hours of the end of each month during July-November.

## III

On appeal, FRI primarily argues that the district court erred in applying the WPCA because it is not incorporated, licensed, or headquartered in West Virginia, and it does not transact business in the state. We disagree.

As noted, the WPCA applies to corporations that are "doing business" in West Virginia, which means "having employees actively engaged in the intended principal activity of the . . . corporation in West Virginia." W.Va. Code § 21-5-1(n). Unquestionably, Gregory was actively engaged in FRI's intended principal activity (i.e., sales) in West Virginia. Between 2004 and 2007, he worked from his West Virginia home as an FRI salesman, servicing West Virginia as well as other locations. Therefore, FRI falls within the plain terms of the WPCA.

FRI urges us to limit the scope of § 21-5-1(n)'s "doing business" language by reading it in pari materia with W.Va. Code

§ 31D-15-1501, which is part of the West Virginia Business Corporation Act and which is titled "Authority to transact business and jurisdiction over foreign corporations." That section provides that "[a] foreign corporation may not conduct affairs in [West Virginia] until it obtains a certificate of authority from the Secretary of State," and it sets forth a non-exclusive list of activities "that do not constitute conducting affairs within the meaning" of the statute. W.Va. Code § 31D-15-1501(a) and (b). It further sets forth a list of activities for which a foreign corporation "is deemed to be transacting business" in West Virginia, and it mandates that a foreign corporation is deemed to agree that service of process on the Secretary of State, in certain circumstances, "has the same legal force and validity as process duly served on that corporation in this state." W.Va. Code § 31D-15-1501(d) and (e).

Because we find that § 21-5-1(n) is plain and unambiguous, there is no reason for us to look to § 31D-15-1501 or elsewhere to attempt to ascertain its meaning. As the Supreme Court of Appeals of West Virginia has explained:

> The rule of in pari materia means that [s]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments. It must be remembered that the rule of in pari materia is a rule of statutory construction and

9

is only utilized where there is some ambiguity in a particular statute. . . .

Furthermore, to say that because several statutes relate to the same subject, they must always be read in pari materia is an oversimplification of the rule. First, it is apparent that what is meant by statutes relating to the same subject matter is an inquiry that is answered by how broadly one defines the phrase "same subject matter." Second, the application of the rule of in pari materia may vary depending on how integral the statutes are to each other. The rule is most applicable to those statutes relating to the same subject matter which are passed at the same time or refer to each other or amend each other. A diminished applicability may be found where statutes are self-contained and have been enacted at different periods of time. Finally, a related statute cannot be utilized to create doubt in an otherwise clear statute.

Berkeley County Pub. Serv. Sewer Dist. v. West Va. Pub. Serv. Comm'n, 512 S.E.2d 201, 208-09 (W.Va. 1998) (internal punctuation altered and citations omitted); see also In re Greg H., 542 S.E.2d 919, 923 (W.Va. 2000) (stating that where the legislature defines a statutory term, "such definition is ordinarily binding upon the courts and excludes any meaning that is not stated").

Apart from the foregoing, we are not persuaded that § 31D-15-1501 would in any event be relevant to an interpretation of § 21-5-1(n). In Kimball v. Sundstrom & Stratton Co., 92 S.E. 737 (W.Va. 1917), the court considered whether a foreign corporation was "doing business" in West Virginia for purposes of a statute that granted a lien in favor of employees for the

10

value of their labor against corporations that were "doing business" in the state. The corporation had contracted to construct railroads in West Virginia; after completing its contracts, it kept on the payroll two employees who generally took care of the plant and property. Eventually, the employees sought to establish a lien against the corporation for unpaid wages.

Although the facts of that case are dissimilar to this case, two points are instructive. First, the court declined to give the statutory language "doing business" a narrow construction. See id. at 739. Second, in considering cases that the corporation argued to support its position that it was not "doing business" in the state, the court indicated its disapproval of looking at other areas of law to ascertain the meaning of the "doing business" language in the context of workers' rights. Specifically, the court stated:

> Most of the cases we find, relating to this subject, involve questions of taxation, jurisdiction by legal process, and the right of foreign corporations to do business in the state, and are unlike the case we have here, involving the right of employees or workmen, performing work or labor, to liens therefor upon the property of a corporation, and to the benefits of the statute.

Id. We believe that FRI's attempt to read § 21-5-1(n) in pari materia with § 31D-15-1501, which has a very different purpose, runs afoul of both of these aspects of the holding in Kimball.

11

FRI also argues that even if the WPCA applies, the district court erred by holding that its commission payments to Gregory violated the act. As noted, the WPCA requires a corporation to pay its discharged employee's wages in full within 72 hours, and a corporation that fails to adhere to this requirement "shall, in addition to the amount which was unpaid when due, be liable to the employee for three times that unpaid amount as liquidated damages." W.Va. Code § 21-5-4(e).

In holding that FRI violated the WPCA, the court concluded that FRI's commission payment policies (which control the amount and timing) contravene the act and, therefore, FRI's reliance on them is unavailing. With this holding, the court found the June commission payment to be untimely because FRI did not pay Gregory within 72 hours of his termination. The court found the post-discharge payments (1) to be untimely because they were not paid within 72 hours of the end of the month in which they were earned and (2) to be less than was owed because FRI reduced them by 50% pursuant to the CPP. In our view, the court is partially correct.

As noted, the WPCA regulates the timing of payment of wages. However, it does not regulate the amount of wages, and it does not establish how or when wages are earned. Rather, these are matters that arise from the employment agreement.

12

See, e.g., <u>Saunders v. Tri-State Block Corp.</u>, 535 S.E.2d 215, 219 (W.Va. 2000) (holding in a WPCA case that the amount of the plaintiff-employee's damages for unpaid commissions was to be determined by the documents establishing the employment relationship); <u>Meadows</u>, 530 S.E.2d at 689 (holding in a WPCA case that fringe benefits, which are a form of "wages" under the WPCA, are set by the employment agreement).

In this case, it appears to be undisputed that the employment agreement between FRI and its salespeople, manifested in the CPP (as modified), established that commissions would be paid on shipped units. Moreover, the employment agreement also established that when a salesperson left employment with FRI, FRI would pay the salesperson 50% of the commission on any order that is logged in and not yet shipped.[3] These provisions do not contravene any provision of the WPCA. Instead, they merely establish the amount of commissions and when they are earned.

Viewing the record in this light, we hold that FRI violated the WPCA by failing to pay Gregory his June commissions (which were earned on units that shipped during June) within 72 hours of his termination. Further, we hold that FRI violated the WPCA

---

[3] To the extent (if any) that FRI's rationale for the 50% reduction is relevant, we note that FRI presented evidence that its salespeople's duties extend beyond delivery of the sold product. Obviously, a salesperson who is no longer employed cannot perform these ongoing duties.

by failing to pay Gregory his full July commissions for units that shipped (and were thus earned) by July 13, 2007, within 72 hours. We do not agree with FRI that its commission payment schedule (as reflected in the CPP and the pay-date memo) relates to when commissions are earned; rather, it simply establishes when they are to be paid. Because the WPCA mandates payments of earned wages within 72 hours of discharge, FRI's reliance on the payment schedule, and its consequential payment of the June commissions and the early July commissions more than 72 hours after termination, runs afoul of the WPCA.

However, we hold that FRI did not violate the WPCA with respect to any commissions based on units that shipped after July 13, 2007. FRI could not have paid those commissions within 72 hours of Gregory's termination because they were not earned at that time under the terms of the parties' employment agreement. Moreover, contrary to the district court's holding, nothing in the WPCA supports the conclusion that those payments had to be made within 72 hours of the beginning of each month. Rather, the WPCA is silent regarding this circumstance.[4]

---

[4] We emphasize that our ruling is based on the specific facts and arguments before us. Thus, we need not decide what remedies might be available if an employer (unlike FRI) unreasonably held wages that were earned at some point after the termination. Moreover, we have no occasion to consider whether FRI's practice of paying commissions on a monthly basis accords
(Continued)

14

Further, FRI's reduction of post-discharge commissions by 50% accords with the employment agreement existing between FRI and its salespeople.

V

Based on the foregoing, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>

---

with the requirement of § 21-5-3(a) that an employer must generally pay wages that are due every two weeks.

DAVIS, Circuit Judge, concurring in part and dissenting in part:

Unlike the majority, I find that Forest River, Inc. ("FRI") violated West Virginia law when it paid Gregory one-half of his standard wages for the sole reason that FRI fired him. On this issue alone, I respectfully dissent.

As the majority notes, the West Virginia Wage Payment and Collection Act ("WPCA") does not regulate the amount of wages and does not establish how or when wages are earned. Maj. Op at 12. But the WPCA does require employers to pay its employees "in full" for work performed, W.Va. Code § 21-5-4(b), and forbids employers from creating contracts that permit them to pay less than that amount. W.Va. Code § 21-5-10. The applicable provision states:

> Except as provided in section thirteen, no provision of this article may in any way be contravened or set aside by private agreement, and the acceptance by an employee of a partial payment of wages shall not constitute a release as to the balance of his claim and any release required as a condition of such payment shall be null and void.

W.Va. Code § 21-5-10 (emphasis added). Thus, under West Virginia law, if Gregory completed his work selling the RVs under contract, FRI cannot change his compensation merely because they fired him. But FRI does exactly that in its

16

Commission Payment Policy ("CPP").  Thus, as applied to the facts in this case, FRI's CCP policy violates the WPCA.[1]

---

[1] FRI argues that the WPCA only precludes agreements under which employees forfeit their statutory right to wages they have earned – and whether the employee has earned the wage or not depends on the employer/employee contract.  Appellant's Br. at 37 (citing Meadows v. Wal-Mart Stores, Inc., 530 S.E.2d 676, 689 (W. Va. 1999), and Gress v. Petersburg Food LLC, 592 S.E.2d 811, 815 (W. Va. 2003)).  The majority accepts these arguments in part, relying on the same cases.  These arguments fail, however, because they assume that the relevant  contract is valid, and here, the contract is invalid because it violates the WPCA by deducting half of an employee's compensation merely because an employee has been fired.

The majority reasons that this court must prioritize the employer's policy over the WPCA, but these cases provide scant support for that approach.  Further, both cases address fringe benefits, which are controlled by a different statutory provision from that related to wages.   In Meadows, the highest court in West Virginia addressed whether WPCA requires employers to pay employees unused sick leave or vacation pay in the same manner as wages, regardless of the terms of the applicable employment policy, upon separation from employment.  The court found that it does not, instead holding that the specific provisions concerning fringe benefits of the applicable employment policy determine whether the fringe benefits at issue are included in the term "wages" under the WPCA.  Meadows, 530 S.E.2d at 690, 217.

In Gress, the court held that before a fringe benefit is payable to an employee, it must have accrued and that accrual is defined by the employer's policy. Gress found that a consistently applied unwritten employment policy (that an employee may only take vacation in five-day increments after each full year of employment and that the employer would not pay employees for partial weeks of unused vacation at the time of discharge) could support an employer's defense against a WPCA suit employees knew about the unwritten policy Gress, 592 S.E.2d at 814-15.

Again, these cases are distinguishable because they address fringe benefits, and the WPCA uses different language for fringe benefits and wages.  Employers may withhold fringe benefits if they have not "accrued" or "vested," but they may not do the same with wages.  W. Va. Code, § 21-5-1(c).

17

The majority argues that FRI is entitled to determine how and how much to pay its employees, and clearly, as a general matter, that is true. But FRI's method of payment is not immune from the WPCA, and the company should not be permitted to use its policy to circumvent the law.

Under the WPCA, if Gregory completed his responsibilities as a salesperson prior to his termination, then Forest River cannot decrease his wages by 50% for any reason, including the reason relied on in this case – that the company fired him. Likewise, if Gregory failed to complete his work, then presumably FRI can compensate him accordingly.[2] See Britner v. Madical Security Card, Inc., 200 W. Va. 352 (1997) (rejecting a challenge to the WPCA from an employer that attempted to contract around W. Va. Code 21-5-10). It does not matter if this 50% decrease is rooted in malice or based on a written policy, under the WPCA; if the decrease is solely because Gregory was fired, it is illegal.

---

[2] Because we _are_ concerned about whether FRI is failing to compensate its employees for fully-performed work, we do care about whether a salesperson's duties extend beyond the delivery of the sold product. These subsequent duties simply do not exist. Cf. Maj. Op. at 13 n.3. It appears that the _only_ task required of Gregory after he made a sale was to compare the original order to the confirmation order generated by the corporate office, a de minimus task at best, and one possibly completed by Gregory prior to his termination. J.A. 81-82.

18

FRI claims that the 50% decrease was because Gregory did not complete his work on the sales that shipped after his termination. The evidence in the record, however, makes it clear that this is not true because Gregory did fulfill his job responsibilities prior to his termination with respect to his sales. Gregory's boss, Kevin McArt, testified that Gregory's responsibilities entailed "[i]n general terms, to close open distribution points and solicit orders." J.A. 69. McArt further testified that other FRI employees handle tasks subsequent to the actual sale, tasks such as the processing, scheduling, coordinating, shipping, invoicing and delivery of the product. J.A. 80-83, 90-91. The point is further evidenced by the fact that FRI did not pay the remaining 50% of Gregory's commission to any other salesperson or employee at FRI. Appellee's Br. at 33-35. Thus, the company earns a windfall when a commission-based employee such as Gregory is terminated. The reality is, at least at FRI, that after the sale is submitted by the salesperson, the salesmen's job is over.[3]

---

[3] FRI claims that it pays departing employees only 50% of their compensation because salespeople who leave the company are not present to perform "the many duties associated with seeing a sale through to shipment." Appellant's Br. at 33. This argument, however, is conclusively refuted by McArt's testimony. Moreover, FRI failed to identify any of these "many duties" in its brief or at oral argument. Lawyer argument should not be accepted as a substitute for probative evidence.

19

Thus, under the WPCA, Gregory is entitled to his full wages for his work, notwithstanding his former employer's attempt to contract around the law of West Virginia. As the district court concluded, FRI should have paid him this money "in full." W. Va. Code 21-5-4(b). Accordingly, I would affirm the judgment in its entirety.